JUDGE JONES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
PORT ROYAL MARINE CO. LTD.,

                Plaintiff,

   - against -

ASTON AGRO-INDUSTRIAL A.G.,

                Defendant.
-------------------------------------------------------------X

08 CV 0485

08 Civ.

ECF CASE

JAN 18 2008
U.S.D.C. S.D.N.Y.
CASHIERS

## VERIFIED COMPLAINT

Plaintiff, PORT ROYAL MARINE CO. LTD ("Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendant, ASTON AGRO-INDUSTRIAL A.G., (hereinafter referred to as "Defendant") alleges, upon information and belief, as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 et seq., and this Court's federal question jurisdiction, 28 United States Code § 1331.

2. At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity organized and existing under foreign law with a principal place of business in Cyprus.

3. Upon information and belief, Defendant was, and still is, a foreign corporation, or other business entity organized and existing under foreign law with a principal place of business in Switzerland.

4. By a charter party entered into on August 31, 2007 on the SYNACOMEX 90 charter party form, Plaintiff chartered to Defendant the M/V MILENA STAR for a carriage of a bulk wheat cargo from Novorossisk, Russia to Alexandria, Egypt. *See charter party attached as Exhibit 1.*

5. In the performance of the aforesaid voyage, there accrued charges for freight in the amount of $750,825.00 and demurrage, *i.e.*, liquidated damages for delays at the loading and discharge ports, in the amount of 504,416.67 for the Vessel. While Defendant effected partial payment to Plaintiff, in breach of the charter party Defendant failed to pay the balance owing to Plaintiff despite due demand.

6. Specifically, pursuant to the Freight Invoice dated November 27, 2007, Defendant has illegally withheld payment of $523,042.30. *See Freight Invoice attached as Exhibit 2.*

7. Pursuant to the charter party, all disputes were to be submitted to arbitration in London with English Law to apply. Plaintiff is preparing to commence arbitration against Defendant in London.

8. Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. As best as can now be estimated, Plaintiff expects to recover the following amounts in the London arbitration:

| | | |
|---|---|---|
| A. | Principal claim: | $523,042.30; |
| B. | Interest on principal claim at 7% compounded quarterly for two years: | $77,871.47 |
| C. | Attorneys' fees and costs of arbitration: | $209,216.00 |
| **Total:** | | $810,129.77. |

9. The Defendant cannot be found within this District within the meaning of

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant.

10. The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A. That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B. That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C. That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee within the District which are due and owing to the Defendant,

in the amount of $810,129.77 calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

D.   That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court

E.   That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F.   That this Court award Plaintiff its attorney's fees and costs of this action; and

G.   That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: January 18, 2008
       New York, NY

                           The Plaintiff,
                           PORT ROYAL MARINE CO. LTD.,


                           By: _____
                           Nancy R. Peterson
                           Charles E. Murphy
                           LENNON, MURPHY & LENNON, LLC
                           The GrayBar Building
                           420 Lexington Ave., Suite 300
                           New York, NY 10170
                           (212) 490-6050 – phone
                           (212) 490-6070 – fax
                           nrs@lenmur.com
                           cem@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York   )
                    )   ss.:   New York City
County of New York  )

1. My name is Nancy R. Peterson

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on behalf of the Plaintiff.

Dated:   January 18, 2008
         New York, NY

_____
Nancy R. Peterson

**Exhibit 1**

CONTINENT GRAIN CHARTERPARTY

adopted PARIS 1957 – amended 1960 – amended 1974 – amended 1990
by SYNDICAT NATIONAL DU COMMERCE EXTERIEUR DES CEREALES
amended 1960, 1974 and 1990 in agreement with COMITE CENTRAL DES ARMATEURS DE FRANCE
in cooperation with the French Chartering and S.A.P. Brokers Association
adopted by the DOCUMENTARY COMMITTEE OF THE BALTIC AND INTERNATIONAL MARITIME COUNCIL

Code name: **SYNACOMEX**
Copyright >>SYNACOMEX<< and >>COMITE DES ARMATEURS DE FRANCE<<
ASTON SYNACOMEX 2004
Buxtehude, 31st August, 2007

ASTON AGRO-INDUSTRIAL AG
Chamerstr. 14
CH-6301 ZUG

1. It is this day agreed between

| | | |
|---|---|---|
| Owners | Owners of the | Port Royal Marine Co. Ltd, Cyprus |
| Vessel | M/V "MILENA STAR" (see also attached rider clauses no. 41-43) | |
| | Carrying about ___ tons grossnett Register and classed ___ tons deadweight exclusive of bunkers. | |
| | now discharging in Lysta, ETA Kerch 17th September, 2007 and expected ready to load about | |
| Charterers | and ASTON AGRO-INDUSTRIAL AG, Zug or nominee to be guaranteed by ASTON | |
| Loading port(s) | 2. That the said vessel being tight, staunch and in every way fit for the voyage, shall with all convenient speed proceed to ___ as Charterers. vessel to be free of disbursements account, Owners paying agency fee only | Kerch, 1 safe anchorage, where |
| | which in case of named port(s) Owners acknowledge as safe and suitable for this vessel and there load | a) always afloat |
| Cargo | In such safe berth, dock, wharf or anchorage as Charterers or their Agents or Shippers may direct a full and complete cargo of wheat and/or maize and/or rye and/or barley of 21,000 metric tons in bulk, stowing abt 47 cbft without guarantee (5% more or less in Owners' option). (Estimated intake about 21,200 mtons) | b) always afloat or safely aground |
| | Shippers have the option of using a second safe berth/anchorage. The time for shifting between the two berths/anchorages shall count as laytime, and shifting expenses shall be for Vessel's account. Warping alongside berth, if required by Shippers, to be always at Owners' risk and expense, but such time used to count as laytime. The cargo shall not exceed what the vessel can reasonably stow and carry over and above her bunkers, apparel, stores, provisions and accommodation. The whole cargo shall be carried and stowed under deck. All cargo on board to be delivered. Furthermore, if dunnage bags have been specifically agreed, the following shall apply: Charterers shall supply for stowage purposes a quantity of bagged cargo not exceeding ___ per cent, which shall be cleared at their risk and expense. The number of bags signed for on Bills of Lading is to be binding on vessel and Owners, unless error or fraud be proved. | |
| Discharging port(s) | 3. Being so loaded, the vessel shall proceed with all convenient speed dired to 1 safe port 1-2 safe berth(s) Egypt (Mediterranean) | |
| | which in case of named port(s) Owners acknowledge as safe and suitable for this vessel, and there discharge the cargo always afloat / b) always afloat or safely aground in such safe berth, dock, wharf or anchorage as Charterers or their Agents or receivers may direct. Receivers have the option of using a second safe berth/anchorage. The time for shifting between the two berths/anchorages shall count as laytime, and shifting expenses shall be for Vessel's account. Warping alongside berth, (if required by Receivers, always to be at Owners' risk and expense but such time used to count as laytime. | |
| Freight | 4. The freight agreed under this Charterparty shall be US$ 34.00 | |
| | per ton of 1,000 kilos on intaken quantity nett Bill of Lading weight, which to be determined by draft survey, less 0.50 per cent and shall be deemed earned as per C/P on completion of loading, as cargo is loaded on board, prepaid discountless and non returnable vessel and/or cargo lost or not lost. The freight shall be paid as follows: 95% of freight within 3 banking days of signing/releasing Bills of Lading marked "FREIGHT PAYABLE AS PER C/P" directly to Owners' nominated bank account. Balance plus demurrage or less despatch money, if any, upon right and true delivery of the cargo and receipt of Owners' final account accompanied by appropriate laytime calculations supported by relevant documents including Statement of Facts/Notice of Readiness with all supporting documents even by fax but latest within 3 weeks. | |
| | Any charges and dues and/or taxes levied on the cargo/freight shall be for Charterers' account and those levied on the vessel for Owners' account. | |
| Loading and discharging | 5. Cargo shall be loaded always afloat ex spout and/or grab trimmed and/or stowed at the expense and risk of Shippers/Charterers at the average rate of 5,000 mtons per weather working day of 24 consecutive hours. | |
| | Cargo shall be discharged at the expense and risk of Receivers/Charterers at the average rate of 5,000 mtons per weather working day of 24 consecutive hours, weather permitting | |
| | Stowage shall be under Master's direction and responsibility. Stevedores' damages, if any, to be settled directly between Owners and Stevedores, but Charterers will assist Owners in every respect to settle same. Shippers' and/or Charterers' representatives/Surveyors have the right to stay be on board this vessel during entire loading, discharging or lightering for the purpose of inspecting the cargo and/or weighing. Charterers and Owners are allowed to work overtime, such expenses shall be for account of the party ordering same, if ordered by the Port Authorities, overtime shall be for Charterers'/Shippers'/Receivers' account respectively. Overtime services rendered by ship's crew shall be in all cases for Owners' account. | |

(C/P MLENA STAR 31.08.2007)

**Laydays/Cancelling**

6. At port of loading laytime shall not count before 8.00 a.m. on the 11th September, 2007 and in any case not before the date notified by the 10 days notice on fixing as per clause No.7. Should the vessel's notice of readiness not be validly tendered as per clause 8 before 08.00 hours noon on the 22nd September, 2007 Charterers shall have the option of cancelling this charter at any time thereafter but not later than one hour after the notice is validly tendered.

**Vessel's Positions, Notice**

7. Master and/or Owners shall give 10 days and thereafter 5 days notice of vessel's expected readiness to load on fixing together with declaration of definite loading port (further addresses, if any, to follow). daily to Charterers via Transocean Trading GmbH, (E-Mail: TRANSOCEAN@GMX.DE, Fax: +4940 53791851) and Agents at Master and/or Owners shall give (further addresses, if any, to follow).

**Laytime**

8. Vessel's written notice of readiness to load and/or discharge shall be tendered at the office of Shippers/Charterers/Receivers or their agents within office working hours, between 08.00 hours and 17.00 hours on all days except Saturdays, Sundays and Holidays and between 08.00 hours and 12.00 hours on Saturdays unless a Holiday. Such notice of readiness shall be delivered by fax/e-mail or telex but in any case WISPON/WISBON/WIFPON/WIFCON when vessel is in the loading or discharging berth/anchorage and in all respects ready to load/discharge. At loading port Shippers/Charterers or their Agents have the privilege to inspect vessel's holds and reject the notice when holds are not clean, dry or dustless and in all respects ready to receive the cargo. In case of dispute, an independent surveyor shall decide about vessel's readiness to load. Owners bearing the costs. If the rejection of notice of readiness is undisputed or confirmed by surveyor the laytime will only start to count after the vessel has validly tendered again when ready. Only when the loading and/or discharging berth/anchorage is unavailable, Master may warrant that the vessel is in all respects ready and may tender notice of readiness to load and/or discharge from any usual waiting place in or outside port limits by cable/radio/telex during office hours, whether in free pratique or not, whether customs cleared or not. At loading port laytime shall commence at 14.00 hours if notice of readiness to load and/or discharge is validly tendered at or before 12.00 hours and at 6 hours after tendering of notice of readiness at discharging port at 08.00 hours on the next working day after the notice to load respectively discharge is validly tendered if notice is validly tendered after 12.00 hours. Time used before commencement of laytime shall not count.

At loading port laytime shall count continuously, Sundays and Holidays included. At discharging port laytime shall not count between 12.00 hours on Saturday or on days preceding a Holiday and 08.00 hours on Monday respectively 08.00 hours on the following working day (or local equivalents), unless used in which case half time actually used shall count, even if used.

Any delays caused by ice, floods, quarantine, or by case of "force majeure" shall not count as laytime unless the vessel is already on demurrage.

When Master has tendered notice of readiness to load or discharge from a waiting place and vessel is subsequently fixed unready in application of the above provisions, laytime or time on demurrage shall not count from the time the vessel is rejected until the time she is accepted. Additionally, any actual time lost on account of vessel's obtaining free pratique or customs clearance shall not count as laytime or time on demurrage. At second or subsequent port(s) of loading or discharging laytime or time on demurrage shall resume counting from vessel's arrival at loading or discharging berth, if available, or from vessel's arrival at a usual waiting place, if berth is unavailable.

At all ports any time lost shifting from waiting place to berth shall not count as laytime or as time on demurrage.

**Demurrage Despatch money**

9. Demurrage is payable by Charterers at the rate of US$ 20,000.00 per day of 24 consecutive hours or pro rata.

Owners shall pay to Charterers despatch money for working time laytime saved in loading/discharging at the rate of US$ 10,000.00 per day of 24 consecutive hours or pro rata. The laytime is non-reversible.

**Seaworthy trim**

10. If ordered to be loaded or discharged at more than one berth and/or port, the vessel is to be laid in seaworthy trim to Master's reasonable satisfaction for the passage between berths and/or ports Charterers' expense at Charterers'/Receivers' expense at discharging ports, and time used for placing vessel in seaworthy trim shall count as laytime or time on demurrage.

**Fumigation**

11. Charterers have the liberty to fumigate the cargo on board by installing phosphide tablets into vessel's holds at loading and discharging port(s) or places en route at their risk and expense, and on their responsibility that Officers and Crew as well as all other persons on board the vessel during and after the fumigation are not exposed to any health hazards whatsoever. Charterers undertake to pay Owners all necessary expenses incurred because of the fumigation and time lost thereby shall count as laytime or time on demurrage. When fumigation has been effected at loading port and has been certified by proper survey or by a competent authority, Bills of Lading shall not be claused by Master for reason of insects having been detected in the cargo prior to such fumigation.

**Lights and gear**

12. Whenever required, vessel shall supply free use of lights as on board but sufficient to carry on night work.
Provided described as geared, vessel, whenever required, shall supply free of use of all cargo handling gear on board, in good working order, with the necessary motive power, and of runners ropes and slings as on board. Shore hands shall be used to drive the gear, at Shippers'/Charterers'/Receivers' expense. Any time actually lost for Owners' account of breakdown of vessel's gear shall not count as laytime or time on demurrage and any stevedore standby time charges incurred thereby shall be for Owners' account.

**Agencies**

13. At loading port, she shall be consigned to Agents nominated by Charterers and appointed by Owners.
At discharging port, she shall be consigned to Agents nominated by Charterers and appointed by Owners.

**Extra insurance**

14. Any extra insurance on cargo due to vessel's age and/or flag class shall be for Owners' account, such extra insurance shall be covered by Charterers for Owners' account and shall be deducted from settlement of freight. Vessel to be free of any extra insurance.

**Brokerage**

15. A brokerage of 1.25 per cent on the gross amount of freight, deadfreight and demurrage earned, is due to: Nico Charbarg, Buxtehude

**Address Commission**

16. An address commission of 2 ½ per cent on the gross amount of freight, deadfreight and demurrage earned is due to Charterers and is deductible from freight deadfreight and demurrage.

**Arbitration**

17. Any dispute arising out of the present contract shall be referred to Arbitration of Chambre Arbitrale Maritime de Paris - 73, Bd. Haussmann - 75008 Paris. The decision rendered according to the rules of Chambre Arbitrale and according to French Law shall be final and binding upon both parties. The right of both parties to refer any dispute to arbitration causes twelve months after date of completion of discharge or, in case of cancellation or non-performance, twelve months after the cancelling date as per clause 6 or after the actual date of cancellation whichever is the later. Where this provision is not complied with, the claim shall be deemed to be waived and absolutely barred in London according to English law and in accordance with the CENTROCON Arbitration Clause which to apply with 8 months to read instead 1 month. See also clause no. 40.

(CP MILENA STAR 31.08.2007)

**Bills of Lading**
18. The Master or Owner is to sign clean Bills of Lading as presented without prejudice to the terms, conditions and exceptions of this Charterparty. If the Master derogates the signing of Bills of Lading to his Agents, he shall give them authority to do so in writing, copy of which is to be furnished to Charterers. When Bills of Lading marked "Freight prepaid" are required, than same handed over to loading port Agents who will keep them in their custody and same to be immediately released by upon Owners' immediately upon receipt of a SWIFT copy taken from Charterers' Bank confirming that advance freight payable has been irrevocably transferred. 102–106

19. Charterers have the right to mark all or part of this Charterparty, they remaining responsible for its due fulfilment. 107

**Reist Deviation**
20. Deviation in saving or attempting to save life or property at sea or for bunkering purposes or any other reasonable deviation shall not be deemed an infringement of this Charterparty and the Owners shall not be liable for any loss or damage resulting therefrom. 108–109

**Lien and Cesser clause**
21. The Owners shall have a lien on the cargo for freight, deadfreight, demurrage, and average contribution due to them under this Charterparty. Charterers' liability under this Charterparty is to cease on cargo being shipped except for payment of freight, deadfreight, and demurrage and except for all other matters provided for in this Charterparty where Charterers' responsibility is specified. 110–112

**Penalties Responsibilities**
22. Penalty for non-performance of this charter shall be limited to the proved damages caused to one of the parties without exceeding the estimated amount of freight. 113

23. 1) The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to this contract and to any Bill of Lading issued hereunder. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply. 114–117

2) In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd, 1968 – The Hague-Visby Rules – apply compulsorily, the provisions of the respective legislation shall apply. 118–119

3) The Owners shall in no case be responsible for loss or damage to cargo howsoever arising prior to loading into and after discharge from the vessel. 120

4) Save to the extent otherwise in this Charterparty expressly provided, neither party shall be responsible for any loss or damage or delay or failure in performance hereunder resulting from Act of God, war, civil commotion, quarantine, strikes, lockouts, arrests or restraint of princes, rulers and peoples or any other event whatsoever which cannot be avoided or guarded against. 121–123

**General Ice clause**
24. **Port of Loading**
a) In the event of the loading port being inaccessible by reason of ice when the vessel is ready to proceed from her last port or at any time during the voyage or on vessel's arrival, the Captain for fear of being frozen in is at liberty to leave without cargo, and this charter shall be null and void.
b) If during the loading the Captain, for fear of being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for Owner's benefit to any port or ports including port of discharge. Any part cargo thus loaded under this charter is to be forwarded to destination at vessel's expense but against payment of freight, provided that no extra expenses by this be caused to the Receivers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per charter.
c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Captain or Owners to be at liberty either to load the part cargo at the open port and to fill up elsewhere for their own account or to declare the charter null and void unless Charterers agree to load full cargo at the open port.

**Port of Discharge**
d) Should ice (except in the Spring) prevent vessel from reaching port of discharge, Receivers shall have the option of keeping the vessel waiting until the re-opening of navigation and paying demurrage, or of ordering the vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given 48 hours after Captain or Owners above given notice to Charterers of the impossibility of reaching port of destination.
e) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

25. If the cargo cannot be totally loaded by reason of Riots, Civil Commotion or a Strike or Lockout on the Railways or at Docks, or other loading places, or if the cargo cannot be discharged by reason of Riots, Civil Commotions or of a Strike or Lockout of any class of workmen essential to the discharge, the time for loading or discharging, as the case may be, shall not count during continuance of such causes, provided that a Strike or Lockout of the Shippers' and/or Receivers' men shall not prevent demurrage accruing if by the use of reasonable diligence they could have obtained other suitable labour at rates current before the Strike or Lockout. In case of any delay by reason of the before-mentioned causes, no claim for damages or demurrage, shall be made by Charterers/Receivers of the cargo, or Owners of the vessel. For purposes, however, of settling despatch money account, any time lost by the vessel through any of the above causes shall count as time used in loading or discharging, as the case may be.

**General average and the New Jason Clause**
26. General average to be adjusted in London according to the York/Antwerp Rules 1994, as amended as last edition, but where the adjustment is made in accordance with the law and practice of the United States of America United Kingdom.

"In the event of accident, danger, damage or disaster before or after commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.
If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees, or owners of the goods to the carrier before delivery."

And the Charterers shall procure that all Bills of Lading issued under this Charterparty shall contain the same clause.

**Both to blame Collision clause**
27. If the liability for any collision in which the vessel is involved while performing this Charterparty falls to be determined in accordance with the laws of the United States of America United Kingdom the following clause shall apply.

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her carriers as part of their claim against the carrying ship or carrier. The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

And the Charterers shall procure that all Bills of Lading issued under this Charterparty shall contain the same clause.

(C/P MILENA STAR 31.08.2007)
War risks ("Voywar 1950")

28. 1) In these Clauses "War risks" shall include any blockade or any action which is announced as a blockade by any Government or any belligerent or any organised body, sabotage, piracy, and any actual or threatened war, hostilities, warlike operations, civil war, civil commotion, or revolution.

2) If at any time before the vessel commences loading, it appears that the performance of the contract will subject the vessel or her Master and crew or her cargo to war risks at any stage of the adventure, the Owners shall be entitled by letter or telegram dispatched to the Charterers, to cancel this Charter.

3) The Master shall not be required to load cargo or to continue loading or to proceed on or to sign Bills of Lading for any port or place which in happens that which or any port at which it appears that the vessel, her Master and crew or her cargo will be subjected to war risks. In the event of the exercise by the Master of this right after part or all cargo has been loaded, the Master shall be at liberty either to discharge such cargo at the loading port or to proceed therewith. In the latter case the vessel shall have liberty to carry other cargo for Owners benefit and accordingly to proceed to and load or discharge such other cargo at any other ports whatsoever, backwards or forwards, although in the contrary direction to or out of or beyond the ordinary route. In the event of this Master electing to proceed with part cargo under this Clause freight shall in any event be payable on the quantity delivered.

4) If at the time the Master elects to proceed with part or full cargo under item 3, or after the vessel has left the loading port, or at the last of the loading ports, if more than one, it appears that the performance of the contract will subject the vessel or her Master and crew or her cargo to war risks, the cargo shall be discharged, or if the discharge is prevented, at any safe port in the vicinity of the port of discharge where she can safely discharge. On delivery of the cargo at such port the Owners shall be entitled to freight as if discharge had been effected at the port or ports named in the Bill(s) of Lading or to which the vessel may have been ordered pursuant thereto.

5) a) The vessel shall have liberty to comply with any directions or recommendations as to loading, departure, arrival, routes, ports of call, stoppages, destination, zones, waters, discharge, delivery or in any other way whatsoever (including any direction or recommendation not to go to the port of destination or to delay proceeding thereto or to proceed to some other port) given by any Government or by any belligerent or by any organised body engaged in civil war, hostilities or warlike operations or by any person or body acting or purporting to act as or with the authority of any Government or belligerent or of any such organized body or by any committee or person having under the terms of the war risks insurance on the vessel, the right to give any such directions or recommendations. If, by reason of or in compliance with any such directions or recommendations, anything is done or is not done, such shall not be deemed a deviation.

b) If, by reason of or in compliance with any such directions or recommendations, the vessel does not proceed to the port or ports named in the Bill(s) of Lading or to which she may have been ordered pursuant thereto, the vessel may proceed to any port as directed or recommended or to any safe port which the Owners in their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfilment of the contract and pursuant thereto.

6) All extra expenses (including insurance costs) involved in discharging cargo at the loading port or in reaching or discharging the cargo at any port other than the port to which she was originally ordered under her charter party shall be paid by the Charterer and/or cargo owners, and the Owner shall have a lien on the cargo for all moneys due under these terms.

29. Owners to satisfy themselves about any prevailing restrictions en route. There are no draft or other restrictions at loading respectively discharging port.

30. For purpose of freight payment procedure Owners to fax on their letter head to Charterers via their brokers the corresponding freight invoice less 2.5% address commission and less 1.25% brokerage based on full freight once loaded quantity of cargo is known.

31. Upon completion of loading/sailing Owners/Master to inform Charterers through their brokers date/time of completion of loading/sailing together with B/L quantity and ETA discharging port. Further ETA advices to be given daily to "TRANSOCEAN" and Agents at destination once nominated.

32. Owners/Master to give daily notices during the whole currency of this C/P including discharging progress.

33. Unless already agreed/nominated, discharging port to be declared by Charterers latest on completion of loading. Owners to guarantee that the Master is instructed to proceed with absolutely full speed from loading port to the declared discharging port without any other delays except for bunkering, which has to be in normal time.

34. The vessel to be suitable for grab discharge.

35. Any difference of weights of vessel's constants ascertained by initial draft surveys both at loading and discharging port to be reported immediately by Master/Owners to Charterers.

36. Owners to stamp and sign (or authorize brokers to do so on their behalf) Original C/P latest within 7 days after fixing.

37. Any Laytime computation to be solely based on Statement of Facts Only.

38. Standard BIMCO I.S.P.S. Voyage clause to apply.

39. Attached clauses no. 40-43 inclusive whereof clauses 41-43 containing vessel's description for which Owners to be responsible in case of misrepresentation of vessel's particulars to be deemed incorporated in this Charter Party.

THE OWNERS:

THE CHARTERERS:

RIDER TO C/P M/V "MILENA STAR", DATED BUXTEHUDE: 31ST AUGUST, 2007 - KERCH/EGYPT (MED)

Clause 40:
Should the dispute between Owners and Charterers not exceed the sum of US$ 50,000.00 excluding cost and interest, both parties should refer the matter in dispute to the sole arbitrator in accordance with the LMAA Claims Procedure (1994).

Clause 41:
Vessel's description:

mv "MILENA STAR"
bc,cyprus flag ,blt 1995
dwat 22056 on 9,11m ssw
grt/nrt 13695/7737,loa/beam 157,6/25,00 m
grain/bale 1033098/999354 cuft
hoha 4/4 ,gear : cranes 4 x 30
speed/cons : abt 13 knots on abt ifo 380 cst 18,00 mt +mdo 1,5 mt
idle/ww mdo 1,2/3,6 mt plus mdo manouvering in/out ports,canal,rivers etc.
(all details 'about')

Clause 42:
Upon Charterers' request Owners have submitted following additional information:

a. vsl's draft basis intaken quantity max 9,70 m mean draft 9,11 m
b. distance waterlevel/top of hatch boarning in ballasted condition (still to be advised)
c. owners confirm vessel to be iam certified  or classed as bulk carrier
d. owners confirm vessel to be equipped with valid certificates as per Solas regulations
e. Owners :Port Royal Marine Co. Ltd., Cyprus
   Managers : Starmarine Management inc ,Glyfada Greece
f. h+m value US$ 28,00 million
g. pandi : The Swedish


Clause 43:
Owners have repied to Charterers questionaire as follows:

01) legal name/address/tlx no/mic of:
    a) original owners and/or managers  STARMARINE MANAGEMENT INC.
       TEL: +302108698066 FAX:+302108980392 - EMAIL: STARMARINE@HOL.GR
    b) disponent owners or t/c owners (if applicable)  PORT ROYAL MARINE CO. LTD CYPRUS
    c) aoh fone/fax numbers of ows mic  CAPT VIGLAS AGGELOS, +302109652402
02) name of vsl (pls adv ex names/ex owners and since when EX YASMIN O / EX BEAUMONT
    under present ownership/management)
03) port of registry - official registry number  LIMASSOL
04) flag + nationality/number of crew - confirm full itf/similar CYPRUS / 21 PHILIPPINO,GRK 2,YUG 1 / P3KW6 /
    cover/call sign / grt+nrt GRT 13.695 / NRT 7.737
05) year/month built + class pls confirm vsl is classed highest  4/1995
    lloyds or equivalent - if equivalent pls adv which
06) confirm engine/bridge aft     OK
07) loa + beam + depth moulded  157.60 / 25.00 / 12.70
08) draft fully laden on ssw/winter + corresponding tpi/c's    Draft SSW: 9.11 m / TPC 32.8MT FL
    dw summer + winter
09) grain/bale cap: total and holdwise distribution (mainholds only)
10) no. of hatches, dims and type of hatchcovers (if tween info to be given for weather- and tweendeck separately – also ofm
    tweendeck bleeding in all holds):
    NO OF HO/HA 4/4 - HYDRAYLIC MCGREGOR FOLDING TYPE
    Hatch Dims:  No1    11.68/17.52 x 20
                 No2-5  17.52x20.80 in mtrs
11) no. of holds    4
    a) are the holds hoppered: YES
    b) confirm no obstacies/obstructions/pillers in holds/on tanktop: CONFIRM OK
    c) confirm tanktop is steel, strenghtened and suibtable for grab discharge: OK
    d) adv if vsl is fully cargobattensfitted: NIL

RIDER TO C/P M/V "MILENA STAR", DATED BUXTEHUDE: 31st AUGUST, 2007 - KERCH/EGYPT (MED)

12) gear: type + capacity, outreach from ships rail, grab fitted ?
 CARGO GEAR : 4x30T CRANES MITSUBISHI ALL FORE
 place/date of last quadrennial cargo gear survey
 OUTREACH 7M / GRAB FITTED NO
 re derricks: pls advise set-up (u/p or selfswinging)
13) owners/disp owners': p+i club      SWEDISH
             ; h+m insurers  ITALIAN MARKET AND OTHER MARKETS THROUGH CAMBIASSO RISSO
             : h+m value    US$ 28,000,000
 owners p+i club incl full add/validity date of cover hull+mach
 insured value incl insurers full style/add.     OK
 name + address of owning company + managers incl tlx/fax/phone
 if disp owners are to/owners pls state date of del and period
 owners bankers / ref mic + account no.
 confirmation from p+i club and hull and machinery insurers tht
 vessel is fully covered by owners/disponent owners for intended
 voyage and until when premiums paid to: ......
14) last special survey 5/05
 last drydocked + bottom painted place + date  N/K
 last hold painting/last sandblasting of holds N/K
15) validity periods of foll certificates:
   a) safety certificate (both eqipment+construction)  4/10
   b) classification and vsl's class/society  4/10
   c) international certificate      4/10
16) masters name: masters nationality: master employed since:  CAPT CASTELLANO RESTITUTO , AUG07
17) vessel's telex/satcom no:  REVERTING
18) distance w/tohc in ballasted condition ABT 11.0M
19) hold ladders fitted - type and dims AUSSIE LADDERS
20) service speed    ABT 12.5
21) airdraft in ballast condition
22) last 3 cargoes carried (starting with last) and name of chrs incl tel nbr/name of mic and name/full style agents at vsl's last port of call.
 GRAIN-CARGILL / GRAIN/ COPPER BILLETS

Addendum No. 1 to Charter Party
MV "Milena Star" dated August 31, 2007

It has this day been mutually agreed between Owners and Charterers:

That the loading port has been changed from Kerch to Novorossisk.

The Owners to be free of disbursements.

The loading rate is 6,000ts shex Friday 05.00 pm/Monday 08.00 even if used.

Charterers to pay US$ 1.50 per tonne extra on entire quantity.

Notice of readiness is understood to have been given on the 17th September 12.00hours.

All other terms and conditions of the CP dated 31st August 2007 to remain unchanged.

Buxtehude September 14, 2007

The Owners:                                                    The Charterers:

**Exhibit 2**

# PORT ROYAL MARINE COMPANY LIMITED

Messrs
Aston. Agro – Industrial AG
c/o Vega star Maritime SA, Piraeus          Athens 27 November 2007

### FREIGHT INVOICE

| MV MILENA STAR / Bulk Wheat / Novorosisk – Egypt Med | |
|---|---|
| Freight 100 pct on 21,150 mt at US$ 35.50 pmt | $750,825.00 |
| Plus demurrage load port | $214,152.78 |
| Plus demurrage disch port | $290,263.89 |
| Total | $1,255,241.67 |
| Less Address comm.          2,50 pct | $31,381.04 - |
| Less Brok. Niko chart comm. 1,25 pct | $15,690.52 - |
| Less advanced freight | $685,127.81 - |
| Balance due to Owners | $523,042.30 |

Transfer to :

H.S.B.C Bank plc
Piraeus Branch. Greece
Swift code : MIDLGRAA
A/C nr : 001-078641-036
f/o : Port Royal Marine Company Limited
Ref : MV Milena Star